# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0928-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.R.,

     Defendant,

and

H.L.C., JR.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
H.C., III, and J.C., minors.

_____

     Submitted November 8, 2023 – Decided December 14, 2023

     Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0126-20.

Joseph E. Krakora, Public Defender, attorney for appellant (James D. O'Kelly, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sara M. Gregory, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant, H.L.C., Jr., appeals from the November 4, 2022, judgment of guardianship that terminated his parental rights to his two sons, H.C., III, born in 2010, and J.C., born in 2016. Both children have been in the care of a resource parent since their removal in February 2019. The resource parent, a family member, is committed to adoption. A.R., the children's mother, executed an identified surrender of her parental rights to the resource parent, who is A.R.'s

A-0928-22

aunt.  As a result, A.R. is not participating in this appeal.[1]  The Law Guardian joins the Division of Child Protection and Permanency (Division) in support of termination.  We affirm.

On March 16, 2020, the Division filed a verified complaint to terminate defendant's parental rights and award the Division guardianship of the children. The complaint detailed defendant's long history of recurring incarcerations, unremitted substance abuse, unaddressed mental health issues, and lack of stable housing despite the Division's exhaustive efforts.  A guardianship trial was conducted on diverse dates between August 19 and October 11, 2022.  At the trial, the assigned Division adoption worker, defendant's drug counselor, the psychologist who evaluated all the parties, and the resource parent testified for the Division.  Numerous documentary exhibits were also admitted into evidence. In addition, a psychologist with a specialty in child psychology testified for the Law Guardian.  Defendant, who was incarcerated at the time of trial, produced no witnesses.

Following the trial, the trial judge rendered a comprehensive oral opinion on the record on October 26 and November 4, 2022, recounting her factual

---

[1]  Defendant and A.R. each have two older children with different partners. None of the four children are in either defendant's or A.R.'s custody and are not involved in this appeal.

3

findings and legal conclusions. Through the adoption worker's testimony, which the judge found "completely credible," the judge detailed the Division's extended involvement with the family dating back to 2007, and pointed out that the Division had filed for "custody, care and supervision" of the children in 2019 because their mother "had relapsed, tested positive for cocaine, and . . . failed to participate in substance abuse treatment," while their father "was incarcerated." The judge explained that when the guardianship complaint was filed, "reunification had not occurred due to [A.R.'s] continued substance use and . . . mental health concerns" and defendant's habitual incarcerations, addiction problem, mental health issues, and chronic homelessness.

The judge recounted that the Division's efforts at reuniting the family included providing "substance abuse assessments and treatments, random urine screens, psychological evaluations, psychiatric evaluations, individual counseling, parenting skills courses[,] domestic violence counseling, anger management counseling, family team meetings, bus cards for transportation, . . . security deposits for housing" as well as visitation with the children, "both supervised and therapeutic." Nonetheless, according to the judge, defendant "had not been compliant with getting treatment to address his

addiction to illicit substances," which included "PCP, heroin, and cocaine," and "had also been incarcerated repeatedly."

The judge stressed that "[d]uring the [ten] years that [the Division] ha[d] been involved with the family, [defendant] ha[d] been in jail the majority of the time." The judge expounded that typically, "when [defendant] is first released from jail, he is very focused and very compliant. . . . but then unfortunately, he relapses and enters into a downward spiral" during which he "stops attending programs," has "no communication with anyone, including his children," and "basically goes missing."

The judge explained that in the process of identifying a suitable placement for the children, the Division had evaluated several individuals, including various family members, all of whom were ruled out with the exception of the resource mother, the children's maternal grand aunt. The judge credited the testimony of the grand aunt, who confirmed her commitment to adopting the children and rebuffed Kinship Legal Guardianship (KLG) as a viable alternative. The judge was satisfied that the grand aunt's commitment to adoption was informed by a full understanding of the differences between KLG and adoption, as it had been explained to her "on many occasions" by "several [Division] workers." The judge further credited the testimony of the Law Guardian's

expert, who evaluated the grand aunt, the birth mother, and the children and opined that "[b]oth children . . . have primary attachment to the [grand aunt] after having lived with her for three[-]and[-]a half years."

The judge found persuasive the expert's unrebutted opinion that the children's "best interest would be served by termination of parental rights followed by the adoption by [the grand aunt]" and that KLG "would not be in the boys' best interest" because "[t]hey desperately need[ed] permanency," particularly H.C., III who had "experienced two removals from his home with his mother," had "ADHD," was "deaf in one ear," and was "deal[ing] with posttraumatic stress disorder [PTSD]" from his exposure to domestic violence between A.R. and defendant.[2]

The judge was also persuaded by the credible testimony of the Division's psychologist, who was qualified as an expert in both "psychology and substance abuse disorders" and "ha[d] evaluated the . . . family over a seven-year period." According to the expert, defendant's "diagnostic impressions" were "major depressive disorder, PTSD with panic attacks, opioid use disorder, antisocial and borderline personality traits." The expert opined that defendant was "unable

---

[2] H.C., III was also diagnosed with "oppositional defiance disorder" and was under the care of a psychiatrist. During his prior removal, he had been placed in various treatment homes.

6

to parent today" or "in the foreseeable future" because he "[could not] prioritize the needs of [the] children over the need for drugs" and "his inability [would] not be remediated in the foreseeable future." Based on the bonding evaluations, the expert further testified that "the children were affectionate with [defendant] but not secure," while they "share[d] a significant, positive, reciprocal emotional attachment" to their grand aunt and looked to her to "meet their needs."

The judge accepted the expert's unrebutted testimony that the children "desperately" needed permanency, particularly H.C., III, "because of his special needs," and "delaying permanency [would be] problematic." Although the expert acknowledged that "there [was] always a risk of harm" associated with "losing a connection with the biological parents permanently," he believed that adoption by the grand aunt "outweigh[ed] the harm of termination of parental rights" and "would do more good than harm because [the children were] thriving with the stability and consistency they [were] experiencing in that home." He stated that "placement with the [grand] aunt has mitigated any harm caused by separation from the biological parents" and opined that removal would be "disruptive" and "traumatic" and "very difficult to remediate."

Next, the judge applied the statutory "best interests of the child" standard, which authorizes the Division to initiate a petition to terminate parental rights if:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The judge concluded the Division "ha[d] proven by clear and convincing evidence that it [was] in the child[ren's] best interest . . . to terminate the parental rights of defendant." As to prong one, the judge found that the children have been harmed because defendant

> has for the majority of these boys' lives been unavailable to them and will continue to be unavailable to them; has failed to address mental health issues; has no housing; has no employment; has been unable to

complete long-term residential drug programs or outpatient programs while not incarcerated; has been unable to remain uninvolved with the criminal justice system; and offers no viable plan to provide for their physical, intellectual, and emotional wellbeing.

As to prong two, the judge found "defendant has not rectified the circumstances that led to the removal of his children," "has never acted as a primary caretaker to his now [eleven] and four-year-old sons," "is unable or unwilling to eliminate the harm [to his children], and delaying permanent placement will add to the harm." As to prong three, the judge determined "[t]he Division provided a comprehensive number of reasonable efforts . . . commencing long before the filing of the guardianship [complaint]," and had "explored" and "ruled out" numerous "relatives and friends."

The judge was satisfied that "there [were] no alternatives to termination," explaining that the resource mother was "a relative . . . who ha[d] been involved with both children since their birth," was described by the children's mother "as a mother to her," and was aware of the differences between adoption and KLG and "did not want [KLG]." Further, the judge stressed that both experts testified that "adoption" rather than KLG "was in the best interest of the children." Finally, relying on the experts' uncontroverted opinions and the overwhelming evidence of defendant's failed efforts to properly parent his children, the judge

9

concluded that termination of defendant's parental rights "will not do more harm than good." The judge entered a memorializing order and this appeal followed.

On appeal, defendant raises the following points for our consideration:

POINT I

THE JUDGMENT OF GUARDIANSHIP MUST BE VACATED AND THE MATTER REMANDED FOR A NEW TRIAL BECAUSE THE COURT ABUSED ITS DISCRETION WHEN IT FAILED TO ENSURE THAT [DEFENDANT] RECEIVED HIS PRESCRIPTION MEDICATION ON EACH TRIAL DATE. WITHOUT MEDICATION, [DEFENDANT] WAS DENIED AN OPPORTUNITY TO MEANINGFULLY PARTICIPATE AT TRIAL.

POINT II

[DEFENDANT] RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUARDIANSHIP TRIAL. (NOT RAISED BELOW)

POINT III

[THE DIVISION'S] WILLFUL FAILURE TO ASSESS A FAMILY MEMBER WILLING TO RAISE THE CHILDREN REQUIRES A REVERSAL OF THE COURT'S JUDGMENT OF GUARDIANSHIP.

Our scope of review in appeals from orders terminating parental rights is limited. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018). In such cases, we will generally uphold the trial court's findings, so long as they are supported by "adequate, substantial, and credible

evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014); see N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012) ("It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights."). Such a decision should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448 (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Even where the parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993),

then quoting C.B. Snyder Realty Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Guided by these standards, we conclude that the judge's factual findings are amply supported by the credible evidence in the record, and her legal conclusions expressed in her comprehensive and well-reasoned oral opinion are unassailable. The judge reviewed the evidence presented at trial, made detailed findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met by clear and convincing evidence all the legal requirements for a judgment of guardianship. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), and comports with governing case law. See, e.g., F.M., 211 N.J. at 447-54; N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 103-07 (2008); In re Guardianship of K.H.O., 161 N.J. 337, 347-63 (1999); In re Guardianship of DMH, 161 N.J. 365, 375-93 (1999); N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11 (1986).

With respect to the "best interests of the child" standard, defendant only challenges the judge's conclusion in connection with the second part of prong three, arguing the Division's failure to assess his brother, P.C., requires reversal of the judgment. P.C. was ruled out as a suitable placement for the children because his background check revealed prior criminal convictions, which

included weapons and drug related offenses. Admittedly, the Division failed to provide P.C. with an official rule-out letter. Nonetheless, the Division met its obligation to prioritize placement with a family member by placing the children with their grand aunt with whom they had a lifelong relationship, in whose home they were thriving, and with whom they were able to maintain family connections.

"The Division must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013). Here, the Division performed the requisite investigation of P.C. The absence of a formal rule-out letter does not warrant reversing the guardianship judgment where the overwhelming evidence establishes that the best interests of the children were served by placement with their grand aunt. See N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 581 (App. Div. 2011) ("Delay of permanency or reversal of termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child.").

Next, we address defendant's argument that the judge's "refusal to ensure [he] was properly medicated before each trial day began . . . was an abuse of

discretion that requires a reversal of the judgment" because the "failure deprived [defendant] of the opportunity for meaningful participation at trial."

"Procedural due process standards require the opportunity for meaningful participation by the person at risk of limitation in any trial in which important rights or interests are to be adjudicated." Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 468 (App. Div. 2003). Although such rights are implicated in an action for termination of parental rights, "[t]he requirements of due process do not confer a constitutional right of confrontation or mandate a parent's presence at the trial." Id. at 467. Still, "[d]ue process evaluations typically call for a balancing of pertinent factors in the situation at hand." Id. at 468.

To that end,

> [t]he protections needed to ensure due process where governmental action is to be taken depend on a careful balancing of three factors: (1) identification and specification of the private interest that will be affected by the official action; (2) assessment of the risk that there will be an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) evaluation of the governmental interest involved, including the added fiscal and administrative burdens that additional or substitute procedures would require.

> [Id. at 465 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).]

See also Santosky v. Kramer, 455 U.S. 745, 754 (1982) (applying Eldridge analysis to termination proceeding).

In New Jersey Division of Child Protection and Permanency v. K.S., we applied the Eldridge analysis to a termination proceeding and held that "[a] parent facing the termination of parental rights is entitled to every reasonable opportunity to produce evidence" in order to satisfy procedural due process. 445 N.J. Super. 384, 394 (App. Div. 2016). Thus, we determined that where a parent wished to testify even after the close of evidence, "the trial court [was] constitutionally obligated to grant the request as long as it [did] not interfere with the children's 'essential and overriding interest in stability and permanency.'" Ibid. (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)). Some states "have held that a parent who is incarcerated or otherwise prevented from attending a termination trial can be afforded due process where the parent receives notice, is represented by counsel, and is given an opportunity to testify by telephone or deposition." M.Y.J.P., 360 N.J. Super. at 468.

The question to be answered in a due process evaluation "is not whether particular procedures were used, but rather whether those procedures which were employed were appropriate and adequate to protect the interests at stake."

15

Id. at 467-68. That said, "'the precise method of participation'" afforded a parent in a termination proceeding "'should generally be left to the discretion of the trial judge.'" Id. at 468 (quoting In re Adoption of Edmund, 739 N.E.2d 274, 277 (Mass. App. Ct. 2000)). Absent an abuse of discretion, we will not second-guess the judge's decision. See N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017) ("'Trial judges are given wide discretion in exercising control over their courtrooms' and have 'the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings.'" (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 264 (App. Div. 2002))). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. I.N.S., 779 F.2d 1260, 1265 (7th Cir. 1985)).

Here, on August 19, 2022, the first day of trial, defendant, who was represented by counsel, appeared virtually from the Hudson County Correctional Facility. During voir dire, defendant confirmed for the judge that he wished to participate in the trial virtually from the correctional facility due

to medical issues. The judge approved defendant's request, advised him that she would allow him to speak privately with his attorney at any time during the trial, and informed him that if he changed his mind and wished to attend the trial in person, she would accommodate his request.

Defendant also asked the judge if she could arrange for him to receive his medications early at the jail. The judge responded she could not "control how [his] medication[s were] administered" but she would direct the medical staff to consult with defendant so that he could discuss his needs with them. The judge cautioned defendant, however, that if he chose "not to join . . . via video link," the trial would proceed in his absence barring some "extenuating circumstances." At the end of the day's proceedings, defense counsel asked the judge to memorialize in the order her warning to defendant that if he refused to appear, the trial would proceed in his absence and the judge agreed.

Defendant appeared for trial via Zoom on the following trial day, August 23, 2022, but refused to appear for trial on August 24, 2022. The judge noted she had not been informed by jail personnel "of any particular issue with [defendant]," other than his "refus[al] to come down." Accordingly, the trial proceeded in defendant's absence, concluding the testimonial portion of the trial. On October 11, 2022, the judge reopened the record to address defendant's

17

letters to the court expressing concerns about "his medical treatment at the jail" along with other issues. During the proceeding, a Sheriff's officer provided sworn testimony confirming that defendant had been transported to the courthouse that morning, had refused to come to the courtroom, and thereafter had been returned to the jail. The officer testified that defendant was not ill, and the Division's attorney submitted defendant's medical records from the jail, which showed "no medical issues . . . that would prevent [defendant] from appearing in court."

Defense counsel indicated on the record that he was "perplexed" by defendant's nonappearance because he had met with defendant the day before and was under the impression that defendant intended to come to court. After confirming with defense counsel that defendant had not expressed any desire to testify, the judge proceeded in defendant's absence. The judge noted they had "done everything . . . to accommodate [defendant]" and to facilitate his participation in the trial, "even recess[ing] on one occasion to allow . . . [defendant] to meet with [another] attorney on other [pending] court matters."

On October 26, 2022, when the judge began placing her oral decision on the record, defendant appeared via Zoom. As the judge delivered her opinion, defendant interrupted the judge, stating he had "just got[ten] a tooth pulled" and

"need[ed his] medication." Defendant also complained that he never received his medication before court despite the judge's prior assurances. The judge directed her staff to "send an email to the jail letting them know that [defendant was] complaining that he . . . need[ed] to be medicated." Thereafter, the judge continued delivering her decision without incident. On November 4, 2022, when the judge completed placing her oral decision on the record, defendant again failed to appear. Defense counsel again expressed surprise at defendant's absence but indicated he was ready to proceed. The judge continued in defendant's absence.

Applying the Eldridge analysis, we are satisfied that under the circumstances, defendant was afforded the opportunity for meaningful participation at trial and we discern no error in the procedure employed by the judge. At all times, defendant received notice of the trial proceedings, was represented by counsel, and was not deprived of an opportunity to testify or produce evidence. Defendant claims he was deprived of due process because the judge failed to ensure that he was properly medicated by jail personnel at the beginning of each trial day. However, defendant provided no medical records from the jail showing that he was deprived of prescribed medications, never specified the medications he was prescribed, nor explained how the timing of

the administration of the medications would affect his ability to participate in the trial. What's more, even if we accept as true defendant's claim that he was deprived of needed medications, he showed no signs of impairment or physical manifestations of illness on the days he attended the trial in a presumably un-medicated state.

In the same vein, defendant argues that he received ineffective assistance of counsel because his attorney "ignored . . . [defendant's] pleas to be properly medicated" and failed to "ensure [defendant was] medicated prior to trial."

To establish ineffective assistance of counsel, defendant "must meet the two-prong test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court for ineffective-assistance-of-counsel claims asserted in matters involving the termination of parental rights [in New Jersey Division of Youth & Family Services v. B.R., 192 N.J. 301, 308-09 (2007)]." N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 116 (App. Div. 2017). To meet the test,

> (1) counsel's performance must be objectively deficient—i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense—i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

20

[B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at 694).]

Unlike criminal cases, the B.R. Court "direct[ed] that claims of ineffective assistance of counsel in termination cases be raised on direct appeal" given "'the need to stabilize the circumstances of the child.'"  Id. at 310-11 (quoting Susan Calkins, Ineffective Assistance of Counsel in Parental-Rights Termination Cases:  The Challenge for Appellate Courts, 6 J. App. Prac. & Process 179, 207 (2004)).  The Court noted:

> In many cases, the issue will be resolvable on the appeal record alone.  For example, if the panel accepts as true appellant's representations regarding the lawyer's shortcomings but determines, on the basis of the full record, that the outcome would not have changed, that will be the end of it.
>
> [Id. at 311.]

Such is the case here.  Even accepting as true defendant's claims regarding his attorney's shortcomings, based on the overwhelming evidence supporting the judge's decision to terminate defendant's parental rights, the outcome would not have been different without the purported deficiencies.  Thus, defendant cannot establish the prejudice prong to justify relief.  We also reject defendant's contention that prejudice should be presumed under United States v. Cronic, 466 U.S. 648 (1984).  In Cronic, the United States Supreme Court identified three

21

rare instances in which counsel's performance is so deficient that prejudice is presumed. 466 U.S. at 659-62. None of the rare circumstances delineated in Cronic are present here. See also State v. Miller, 216 N.J. 40, 61-62 (2013) (determining there was "no authority in this Court for the expansion of the presumption of prejudice beyond the narrow parameters set in Cronic"). To the extent we have not specifically addressed a particular argument, we deem it without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION